## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:19-cv-00009-MR

| | |
|---|---|
| NEXUS TECHNOLOGIES, INC.,<br>DANIEL CONTI, and BENJAMIN<br>BOMER,<br><br>        Plaintiffs,<br><br>   vs.<br><br>UNLIMITED POWER, LTD., and<br>CHRISTOPHER J. PETRELLA,<br><br>        Defendants,<br>_____<br><br>UNLIMITED POWER, LTD., and<br>CHRISTOPHER J. PETRELLA,<br><br>    Counterclaim-Plaintiffs,<br><br>   vs.<br><br>NEXUS TECHNOLOGIES, INC.,<br>DANIEL CONTI, BENJAMIN BOMER,<br>and EDWARD PRATHER,<br><br>    Counterclaim-Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>__<u>**MEMORANDUM OF**</u><br>__<u>**DECISION AND ORDER**</u><br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**THIS MATTER** is before the Court on "Plaintiffs/Counterclaim-Defendants' Motion for Summary Judgment" [Doc. 44].

# I. BACKGROUND

On January 9, 2019, Nexus Technologies, Inc. ("Nexus"), Daniel Conti ("Conti"), and Benjamin Bomer ("Bomer") filed this civil action against Unlimited Power Ltd. ("Unlimited Power") and Christopher J. Petrella ("Petrella") (collectively, "the Defendants") to correct the inventorship of U.S. Patent Nos. 9,865,903 (the '903 Patent), 10,084,213 (the '213 Patent), D807,816 (the '816 Patent), and D815,030 (the '030 Patent and collectively the "Patents"), which each lists Petrella as the sole inventor. [Doc. 1]. The Defendants moved for dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that the Complaint failed to state claims upon which relief can be granted. [Doc. 11]. The Court denied the Defendants' motion. [Doc. 14].

On July 14, 2019, the Defendants filed an Amended Answer, asserting counterclaims against Nexus, Conti, and Bomer, and third-party claims against Edward Prather ("Prather")[1] for (1) negligent misrepresentation, (2) breach of contract, (3) unjust enrichment/quantum meruit, (4) conversion, (5)

---

[1] In both the Defendants' Amended Answer and the Plaintiffs' Reply, the claims asserted against Prather are erroneously referred to as "counterclaims," even though he is not a named plaintiff in the action. For the sake of simplicity, and in keeping with the conventions used by the parties, the Court will refer to the Defendants' third-party claims against Prather as "counterclaims" and will refer to Nexus, Conti, Bomer, and Prather collectively as "the Plaintiffs."

constructive fraud, (6) unfair and deceptive trade practices in violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 *et seq.* ("UDTPA"), and (7) civil conspiracy. [Doc. 16]. The Plaintiffs sought dismissal of these counterclaims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that the Defendants had failed to state claims upon which relief can be granted. [Doc. 17]. The Court granted the motion on the counterclaims for negligent misrepresentation, constructive fraud, and civil conspiracy and denied the motion on the counterclaims for breach of contract, unjust enrichment, conversion, and unfair and deceptive trade practices. [Doc. 20].

On September 22, 2020, the Plaintiffs filed the present Motion for Summary Judgment on all the claims remaining in this case brought by them and those brought against them. [Doc. 44]. On October 13, 2020, the Defendants responded. [Doc. 50]. On October 19, 2020, the Plaintiffs replied. [Doc. 51].

Having been fully briefed, this matter is ripe for disposition.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers, admissions, stipulations, affidavits, and other materials on the record show "that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)&(c). "As the Supreme Court has observed, 'this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).

"Facts are material when they might affect the outcome of the case, and a genuine issue exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." Ballengee v. CBS Broad., Inc., 968 F.3d 344, 349 (4th Cir. 2020) (quoting News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010)). The Court does not make credibility determinations or weigh the evidence when ruling a motion for summary judgment. Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat, 346 F.3d at 522. If this showing is made, the burden then shifts to the nonmoving party who must convince the Court that a triable issue does exist. Id.

4

In considering the facts on a motion for summary judgment, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor. Smith v. Collins, 964 F.3d 266, 274 (4th Cir. 2020).

## III.  FACTUAL BACKGROUND[2]

This action involves the invention and production of a portable solar renewable energy system.  The Plaintiffs' claims regarding inventorship present the question of who were the true inventors of the patented device. It is undisputed that, sometime before 2013, Defendant Petrella developed the basic concept for the device, and that Plaintiffs Conti and Bomer participated in its further development.  Defendant Petrella alone, however, applied for and received the patents, without the knowledge of Conti or Bomer.  Plaintiffs Conti and Bomer assert that they are the true inventors of the device described in the patents and that Petrella is not.

The concept presented by Petrella featured solar panels connected to a battery that discharged electrical current to provide electricity for charging devices.  Petrella made a "very crude" prototype of his system.  [Doc. 45-5

---

[2] This summary of facts is presented for the analysis of the Plaintiffs' Motion for Summary Judgment, so the facts are viewed in the light most favorable to the Defendants as the non-moving parties.

at 7].  Petrella also had a Chinese company manufacture a prototype of his system.  [Id. at 8].  Petrella decided to seek further assistance with his idea because he believed that the Chinese prototype had "inherent design flaws" and needed improvement.  [Id.].

In January 2013, Petrella met with Conti and Robert Jolly, a third-party investor, to discuss his portable energy system.  [Id. at 18].  Petrella brought his prototype, the Chinese prototype, and a competitor's similar product to the meeting.  [Id. at 22].  During that meeting, Petrella gave Conti ideas for improving the systems he had and described the system he ultimately wanted to create.  [Id. at 22-23].  Specifically, Petrella testified that he "explained the solar panel system, the circuits, the fact that I wanted these devices to be 100 percent made in the United States," and that he wanted "two high efficiency solar panels that would be placed in a cavity in the device."  [Id.].  Conti took notes on Petrella's ideas.  [Id. at 22-23].  Conti testified that Petrella offered no technical information during the January 2013 meeting.  [Doc. 45-11 at 10-11].  Robert Jolly submitted a declaration stating that he does not recall Petrella giving Conti any technical information or design instructions.  [Doc. 45-10 at ¶ 5].  Petrella admits that he never discussed specifics about how the solar panels would be configured, how the solar panels could be deployed, or how the solar panels would be hinged

6

to the device during the January 2013 meeting. [Doc. 45-5 at 23]. Instead, Petrella testified that he asked Conti to have Nexus make only the circuit boards for his device and that he was going to try to resolve the hinging issues by consulting a mechanical enclosure manufacturer. [Id.].

After the meeting in January 2013, the parties did not communicate again until March 5, 2013, when Petrella received an email from Conti containing a document titled "PREPS Proposal Version 1." [Id.; Doc. 45-2]. The PREPS Proposal contained "the design of a portable hybrid photovoltaic and battery power system" and contained design details, diagrams, a total project cost, and a statement that Nexus owned all intellectual property contained therein. [Doc. 45-2 at 3-15]. Petrella testified that the PREPS Proposal merely transcribed the ideas that he gave to Conti during the January 2013 meeting, but conceded that the PREPS Proposal was "laid out a lot better than I could do[.]" [Doc. 45-5 at 24]. Petrella further testified that he had no recollection of any conversations that he had with Conti or anyone else at Nexus about his device between the January 2013 meeting and his receipt of the PREPS Proposal in March 2013. [Id. at 24]. Conti also testified that Petrella offered no input on the creation of the PREPS Proposal between the January 2013 meeting and the delivery of the PREPS Proposal in March 2013. [Doc. 45-11 at 25].

7

In addition to setting forth the design of the proposed product, the PREPS Proposal stated that "[u]pon receiving a purchase order, Nexus will provide a detailed Project Schedule with tasks and milestones." [Doc. 45-2 at 10]. Petrella testified that Unlimited Power never sent Nexus a purchase order for the work detailed in the PREPS Proposal. [Doc. 45-5 at 26].

Petrella testified that the parties' business relationship changed after he received the PREPS Proposal. [Id. at 17, 26]. According to Petrella, the new arrangement provided the he would purchase 10,000 circuit boards from Nexus on a cost-plus basis. [Id. at 26, 41]. Petrella testified that Nexus never provided a written guarantee or confirmation that it would supply 10,000 circuit boards. [Id. at 41]. Petrella testified that although the parties came to an oral understanding regarding the purchase of the circuit boards but that the agreement was never reduced to writing. [Id. at 26].

On February 9, 2014, Conti sent Petrella an email with an attachment titled "PREPS Proposal Version 2." [Id. at 27]. This new proposal added lithium-ion batteries to the design of the original PREPS Proposal. [Id.].

On February 24, 2014, Petrella filed Provisional Application Number 61/966,378 ("the '378 Application") with the United States Patent and Trademark Office ("PTO"). [Id. at 30]. Petrella testified that the '378 Application was largely duplicative of the description of the power system,

8

design details, and diagrams set forth in the PREPS Proposal, except that it removed any references to Nexus. [Id.]. Petrella does not remember providing any other documents as a basis for the '378 Application. [Id.]. The '378 Application ultimately led to the '903 Patent and the '213 Patent. [Id. at 25].

In 2015, Petrella formed Unlimited Power and began working as its Chairman and CEO. [Id. at 7, 12, 26]. At that point, the parties began discussing a merger between Nexus and Unlimited Power in place of the agreement for Nexus to merely provide circuit boards or manufacture the system. [Id. at 18]. Petrella also worked as a lobbyist for Nexus during this time. [Id. at 19].

On October 19, 2015, Conti sent Petrella an email containing design renderings for the system. [Id. at 36; Doc. 45-12]. Those images were created by Bomer, a design engineer for Nexus, after he had made roughly fifty sketches working under Conti's direction. [Doc. 45-11 at 30-31].

On September 29, 2016, Petrella filed with the PTO two applications for design patents, Application Numbers 29/579,328 ("the '328 Application") and 29/579,349 ("the '349 Application"). [Doc. 45-5 at 36]. Those Applications contained the images created by Bomer. [Doc. 45-11 at 30].

Those Applications led to the '816 Patent and the '030 Patent, which are design patents. [Id. at 26].

The previous month, on August 26, 2016, Petrella sent Conti a text message saying that he needed Conti to send him a "manufacturing agreement between [Unlimited Power] and Nexus before my meeting on Tuesday." [Id. at 28]. Petrella testified that the text message was requesting a written manufacturing agreement memorializing the oral agreement they had already reached. [Id. at 29]. Petrella testified that under the oral manufacturing agreement Nexus agreed "to project manage, build the circuit boards and find the suppliers" and in exchange "would be paid [by] or merged with" Unlimited Power. [Id.]. Petrella testified that Nexus never provided a written manufacturing agreement and that the parties never agreed on terms for a merger. [Id.].

In January 2017, Unlimited Power and Petrella "shifted their focus" to getting a different manufacturer, NEO Tech, to help make prototypes of the system. [Doc. 45-5 at 40]. Petrella testified that Unlimited Power began speaking with NEO Tech because of concerns about whether Nexus was delaying the merger agreement and otherwise negotiating in bad faith. [Id.].

On January 9, 2018, the PTO approved the '378 Application and issued the '903 Patent, which names Petrella as the sole inventor. [Doc. 45-

6].  The '903 Patent describes the claimed invention as comprising of a first and a second solar panel "hingeably attached to the enclosure" with the second panel "deployable away from a solar cavity defined in the enclosure." [Id. at 2].  The '903 Patent further states that when closed, the "second solar panel is stored and received within the enclosure and the panel cavity is covered by an exterior portion of the enclosure."  [Id. at 13].

A week later, the PTO approved the '328 and '349 Applications and issued the '816 Patent and the '030 Patent, both naming Petrella as the sole inventor.  [Doc. 45-8; Doc. 45-9].  These design patents contain the images that Bomer created and Conti sent to Petrella in 2015.  [Doc. 45-11 at 30].

In August 2018, the merger negotiations between the parties ended. [Doc. 45-5 at 40].  According to Petrella, the negotiations ended because Nexus never provided the financial information that was necessary to consummate the merger.  [Id. at 44].  On August 23, 2018, Douglas Kim, counsel for Unlimited Power, sent an email to Nexus's attorney, which stated:

> [T]here is no need to work on any supply agreement or otherwise.  Nexus seems to keep demanding co-ownership of Unlimited Power's Intellectual Property as a predicate to any agreement.  This is not acceptable.  Also, just so there is no misunderstanding, I have been asked to clarify that **there are no contractual relationships or otherwise between Unlimited Power and Nexus Technologies**.  Please let your client know that there

> is no need for our clients to continue discussions as they were unable to reach any type of agreement. Again, for clarity, if your client believes that there are any such agreements, they are immediately terminated.

[Doc. 45-3 at 2 (emphasis added)]

After the merger discussions ended, Nexus started examining the possibility of developing a portable renewably energy system to salvage the design costs it expended on this invention. [Doc. 45-11 at 31]. Those efforts culminated with the creation of the "kWAD," a portable renewable energy system that Nexus currently offers for sale. [Id. at 32].

On September 25, 2018, the PTO issued the '213 Patent, which names Petrella as the sole inventor. [Doc. 45-7]. The '213 Patent, which also derives from the '378 Application, describes the claimed invention as having an enclosure with "a first side hingeably attached to a second side carried by the enclosure." [Id. at 11]. The '213 Patent describes deployed and undeployed positions for the solar panels and duplicates the solar panel configuration that was in the PREPS Proposal. [Id.]. The '213 Patent includes figures that are derived from the images in the PREPS Proposal. [Doc. 45-2 at 5; Doc. 45-7 at 4].

12

## IV.    DISCUSSION

### A.    Defendants' Counterclaims

The Plaintiffs move for summary judgment on the Defendants' remaining counterclaims for breach of contract, unjust enrichment, conversion, and unfair and deceptive trade practices. [Doc. 44].

### 1.    Breach of Contract

The Defendants assert a breach of contract counterclaim against the Plaintiffs based on the existence of three different "contracts": (1) an alleged agreement between Petrella and Nexus related to the design and purchase of circuit boards stemming from the PREPS Proposal; (2) a separate, alleged agreement between Petrella and Nexus related to the design and purchase of circuit boards on a cost-plus basis stemming from the parties' discussions; and (3) an alleged agreement between Unlimited Power and Nexus to merge the two companies. [Doc. 50 at 17-22].[3]

The Plaintiffs move for summary judgment on the Defendants' counterclaim for breach of contract, contending that there is no forecast of

---

[3] Based on the Defendants' pleadings, it is unclear when any agreement between the two parties was allegedly formed. While the PREPS Proposal exchange and many other discussions between Petrella and Nexus took place in 2013, it is undisputed that Unlimited Power was not formed until 2015. [Doc. 45-5 at 7]. As such, the Court will address this claim based on the Defendants' pleading giving notice of a claim based on an agreement between Petrella and Nexus that was either enforceable by him or assigned to Unlimited Power.

13

evidence sufficient to establish a "meeting of the minds" between the parties as to any of the alleged agreements and, in any event, there was no valid and enforceable contract under the statute of frauds. [Doc. 45 at 20-25]. The Defendants respond that the statute of frauds does not apply because the parties' conduct indicates the existence of a contract and the parties intended an agreement for services. The Court will discuss each of the alleged agreements in turn.

### a. PREPS Proposal

"In the formation of a contract an offer and acceptance are essential elements." Yeager v. Dobbins, 252 N.C. 824, 828, 114 S.E.2d 820, 823 (1960). To constitute an acceptance, the offer "must be accepted in its exact terms." Dobbs v. Trust Co., 205 N.C. 153, 156, 170 S.E. 652, 653 (1933).

Although the PREPS Proposal stated that "[u]pon receiving a purchase order, Nexus will provide a detailed Project Schedule with tasks and milestones[,]" [Doc. 45-2 at 10], Petrella testified that he never sent Nexus a purchase order or agreed to pay the amounts outlined in the PREPS Proposal. [Doc. 45-5 at 26]. Moreover, Petrella testified that the parties continued negotiating for several years after he received the PREPS proposal and that the terms of the alleged agreement between the parties changed from those that were outlined in the PREPS Proposal. [Id. at 26-

14

27]. In August 2018, however, Unlimited Power's attorney sent an e-mail to Nexus's attorney stating that "there is no need to work on any supply agreement or otherwise[,]" and that "there are no contractual relationships or otherwise between Unlimited Power and Nexus Technologies." [Doc. 45-3 at 2]. As such, while the PREPS Proposal may have constituted an offer, the Defendants' own forecast of evidence shows that the offer was never accepted. See Yeager, 252 N.C. at 828, 114 S.E.2d at 823; Dobbs, 205 N.C. at 156, 170 S.E. at 653. Accordingly, the PREPS Proposal cannot serve as the basis for the Defendants' breach of contract counterclaim.

### b. Cost-Plus Basis Agreement

According to Petrella, the proposed deal changed after he received the PREPS Proposal to a structure where Nexus would make circuit boards and sell them to Petrella on a cost-plus basis. [Doc. 45-5 at 17, 26]. Petrella further testified that Unlimited Power would purchase around 10,000 circuit boards at roughly $50 per board under this agreement. [Id. at 18-19]. According to Petrella, there was an offer and acceptance between the parties regarding this structure. [Id. at 26].

"It is a well-established principle of contract law that a contract for sale of goods for the price of $500 or more is not enforceable unless there is some writing sufficient to indicate that a contract has been made and it is signed

by the party against whom enforcement is sought." <u>Avanti Hearth Prod., LLC</u> <u>v. Janifast, Inc.</u>, No. 3:10-cv-00019-FDW-DCK, 2011 WL 5600634, at *5 (W.D.N.C. Nov. 16, 2011) (Mullen, J.) (citing N.C. Gen. Stat. § 25–2–201). Here, the agreement described by Petrella would have been a contract for the sale of goods for more than $500. [Doc. 45-5 at 18-19]. Accordingly, that alleged agreement can only be enforced against Nexus if it was reduced to writing and signed by Nexus.

Petrella testified that he cannot recall any signed documents that would show a commitment by Nexus to make circuit boards or an agreement between the parties regarding the purchase and sale of circuit boards. [Doc. 45-5 at 19, 26]. Petrella has provided no other forecast of evidence to show that there was a written agreement between the parties that was signed by Nexus. While Petrella testified that the parties exchanged "drafts of a supply agreement" in 2015 and 2016, he acknowledged that those "agreements were not signed by Nexus[.]" [Doc. 45-5 at 29]. Unlimited Power's attorney also acknowledged that the parties had not signed a supply agreement as of August 2018. [Doc. 45-3 at 2]. Because Petrella has provided no written agreement signed by Nexus regarding the purchase and sale of circuit

16

boards,[4] any such agreement made by the parties is unenforceable under the statute of frauds. Accordingly, the alleged agreement between Unlimited Power and Nexus regarding such purchase and sale of circuit boards on a cost-plus basis cannot serve as the basis for the Defendants' breach of contract counterclaim.[5]

### c. Merger Agreement

Petrella testified that the parties never reduced to writing their agreement regarding the design and manufacturing of the invention in question, but that the parties spent several years pursuing that goal with the understanding that it would lead to the parties' merger. [Doc. 45-5 at 18]. Petrella testified repeatedly, however, that the parties were never able to agree on terms for a merger. [Id. at 16, 29]. Moreover, after the merger discussions ended in 2018, Unlimited Power's attorney sent an e-mail stating

---

[4] In fact, the Defendants have not even presented any documents indicating that any such circuit boards were *even ordered* from Nexus.

[5] The Defendants argue that the alleged agreement to sell circuit boards is enforceable despite the lack of a written agreement because it was related to the provision of services, not goods. [Doc. 50 at 13-14]. The evidence, however, shows that the contract between the parties would have culminated in the sale of the circuit boards, not just the design of those circuit boards. The Defendants cite no law stating that the North Carolina statute of frauds excuses a failure to provide a signed written agreement when the contract was for both goods and services. Even if the Defendants had cited such a provision, it is difficult to see how it could apply here. There would be little left of the statute of frauds if it did not apply whenever some services are provided to make goods that are sold for more than $500 (e.g., the service of manufacturing the goods so that the goods can then be transferred and sold, or the service of delivering the goods sold).

17

that "there are no contractual relationships or otherwise between Unlimited Power and Nexus Technologies." [Doc. 45-3 at 2]. Based on that forecast of evidence, no reasonable jury could conclude that the parties reached an agreement regarding the merger of Unlimited Power and Nexus. Accordingly, the alleged merger agreement between the parties cannot serve as the basis for the Defendants' breach of contract counterclaim.

For all these reasons, the Plaintiffs' Motion for Summary Judgment on the Defendants' breach of contract counterclaim will be granted.

### 2. Unjust Enrichment

Next, the Plaintiffs move for summary judgment on the Defendants' counterclaim for unjust enrichment, arguing that Unlimited Power cannot establish unjust enrichment because federal patent law preempts state-law claims related to the content of patents and Unlimited Power has provided no evidence to show that the Plaintiffs received technical information beyond what is covered by the Patents. [Doc. 45 at 25].

Federal Circuit law governs whether federal patent law preempts a state law claim. Midwest Indus., Inc. v. Karavan Trailers, Inc., 175 F.3d 1356, 1361 (Fed. Cir. 1999). The Federal Circuit has held that federal patent law preempts a state-level unjust enrichment claim related to the subject-

matter of patents.  Ultra-Precision Mfg., Ltd. v. Ford Motor Co., 411 F.3d 1369, 1382 (Fed. Cir. 2005).

The Plaintiffs previously moved to dismiss the Defendants' unjust enrichment claim, arguing that it is preempted by federal law.  [Doc. 17].  In opposing that motion, the Defendants argued that their unjust enrichment counterclaim is based on some "technical information and designs related to [Unlimited Power's] renewable energy system" beyond what was covered by the Patents.  [Doc. 18 at 10].  The Court denied the Plaintiffs' motion to dismiss, but warned that the Defendants ultimately "will need to show that Nexus is being unjustly enriched by information that is not covered by the patents" to prevail on the unjust enrichment claim.  [Doc. 20 at 10 n.2].  Now faced with the Plaintiffs' Motion for Summary Judgment, the Defendants provide no forecast of evidence regarding any such technical information that is unjustly enriching the Plaintiffs.  Instead, the Defendants generally argue that "Nexus benefited from design and technical ideas from Mr. Petrella that ultimately did not end up in the patent applications[.]"  [Doc. 50 at 26].  That general assertion provides no basis from which a reasonable jury could conclude that the Plaintiffs were enriched by designs or technical information beyond what is contained in the Patents.

19

The Defendants further argue, however, that the Plaintiffs "benefited from learning from Mr. Petrella what requirements needed to be met in order to secure government contracts" and that they "also benefited from Mr. Petrella's knowledge of which governmental agencies were actively interested in ordering portable renewable energy systems." [Id.]. While the Defendants seem to argue that the Plaintiffs unjustly benefitted from Petrella's knowledge of government contracts and governmental agencies, Petrella testified that he worked as a lobbyist for Nexus and was paid for the services that he provided. [Doc. 45-5 at 19]. "The general rule of unjust enrichment is that where services are rendered and expenditures made by one party to or for the benefit of another, *without an express contract to pay*, the law will imply a promise to pay a fair compensation therefor." Krawiec v. Manly, 370 N.C. 602, 615, 811 S.E.2d 542, 551-52 (2018) (emphasis added) (citations omitted). "Since the parties do not dispute the existence of a contract in this case, there can be no recovery . . . on the theory of unjust enrichment." Planet Earth TV, LLC v. Level 3 Commc'ns, LLC, No. 1:17-cv-00090-MR-DLH, 2018 WL 3660205, at *3 (W.D.N.C. Aug. 2, 2018) (Reidinger, J.). Accordingly, the information cited by Petrella cannot serve as the basis for an unjust enrichment claim.

20

Because the Defendants have failed to provide a sufficient forecast of evidence from which a jury could reasonably conclude that the Plaintiffs have been unjustly enriched by information that is not covered by the Patents, the Plaintiffs' Motion for Summary Judgment on the Defendants' unjust enrichment counterclaim will be granted.

### 3. Conversion

The Plaintiffs move for summary judgment on the Defendants' counterclaim for conversion, arguing that there is no forecast of evidence to show that the Plaintiffs converted technical information that is not covered by the Patents. [Doc. 45 at 25].

Conversion is defined as "an unauthorized assumption and exercise of the right of ownership over good or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." Norman v. Nash Johnson & Sons' Farms, Inc., 140 N.C. App. 390, 414, 537 S.E.2d 248, 264 (2000) (citation omitted). North Carolina law does not allow for conversion claims related to intangible interests, such as patents. See Precision Components, Inc. v. C.W. Bearing USA, Inc., 630 F. Supp. 2d 635, 642 (W.D.N.C. 2008) (Reidinger, J.). As such, the Defendants' conversion claim cannot be based on the Patents.

21

At the motion to dismiss stage, the Defendants argued that their conversion claim is based on "the technical information and specifications for a portable renewable energy system" beyond what is covered by the patents, including blueprints, design schematics, and production protocols. [Doc. 16 at ¶¶ 142-46; Doc. 18 at 10, 12].  Now faced with a motion for summary judgment, the Defendants present no forecast of evidence to show that the Plaintiffs converted any blueprints, design schematics, or production protocols.  Likewise, the Defendants provide no forecast of evidence to show the conversion of other tangible embodiments of designs, technical information, or knowhow that were not contained in the Patents.[6]  Because the Defendants have failed to show that the Plaintiffs received any technical information beyond what is covered by the Patents, the Plaintiffs' Motion for Summary Judgment on Defendants' conversion counterclaim will be granted.

### 4.    UDTPA Claim against Nexus

The Defendants bring a counterclaim under the UDTPA, asserting that Nexus acted unfairly and deceptively by intentionally misrepresenting its intention to enter into a contract with Unlimited Power with the intent of using

---

[6] At best, the Defendants' evidence seems to show that the Plaintiffs received *intangible* designs and information, which is insufficient to support a conversion claim.

that time to develop and bring a competing invention to market. [Doc. 50 at 19-21]. Nexus moves for summary judgment on the Defendants' UDTPA counterclaim. [Doc. 45 at 26-27].

A UDTPA claim requires (1) an unfair or deceptive act or practice; (2) in or affecting commerce; which (3) proximately caused actual injury to the claimant or their business. N.C. Gen. Stat. § 75-1.1. An act is deceptive "if it has a tendency or capacity to deceive." Rahamankhan Tobacco Enterprises Pvt. Ltd. v. Evans MacTavish Agricraft, Inc., 989 F.Supp.2d 471, 477 (E.D.N.C. 2013). An act is unfair "if it offends established public policy," "is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," or amounts to an inequitable assertion of ... power or position." Id. "The determination of whether an act is unfair or deceptive is a question of law for the court. The question of whether the defendant acted in bad faith is not pertinent." Bernard v. Cent. Carolina Truck Sales, Inc., 68 N.C. App. 228, 230, 314 S.E.2d 582, 584 (1984). "What is an unfair or deceptive trade practice usually depends upon the facts of each case and the impact the practice has in the marketplace." Durling v. King, 146 N.C. App. 483, 489, 554 S.E.2d 1, 4 (2001) (citing Pan American World Airways, Inc. v. United States, 371 U.S. 296 (1963)).

Petrella asserts that Nexus negotiated in bad faith as evidenced by Nexus missing several deadlines to provide a prototype, refusing to provide the financial information necessary to complete the merger, and changing the terms of the merger whenever the parties came close to an agreement. [Doc. 45-5 at 43].

Petrella testified that "Nexus claimed that they would have prototypes available for us to show and us to market and for us to sell. They never delivered to us any prototypes on the dates that they were supposed to be delivering them, on the time they were supposed to be delivering them." [Id.]. According to Petrella, "if [Nexus] ran their commercial organization the way they ran creating prototypes for Unlimited Power, then they would not have been in existence as long as they have been." [Id.].

Petrella further testified that "Nexus did not negotiate the merger agreements in good faith. They were stall tactics." [Id.]. According to Petrella, whenever "negotiations would get down to I think we have something, we have something mutually beneficial, Nexus would then throw some weird left field: We want more money. We're not going to do this. We don't like the structure[.]" [Doc. 45-5 at 44].

Petrella claims that Nexus negotiated in bad faith "to keep [Unlimited Power] from producing product, having things built and selling them into the

24

marketplace strictly with the purpose of keeping [Unlimited Power] starving, not able to realize its full potential in sales and requests in order to file a frivolous lawsuit claiming ownership." [Id. at 43-44]. Petrella claims that Unlimited Power lost purchase orders from companies in Panama and Haiti because Nexus negotiated in bad faith and failed to produce a prototype. [Id. at 45].[7]

The Defendants' forecast of evidence shows that Nexus consistently changed the terms of the agreement whenever the parties came close to finalizing a merger. [Doc. 45-5 at 44]. That forecast further shows that the merger discussions between the parties collapsed when Nexus refused to provide certain financial information and changed the terms of the merger "at the last minute." [Id.]. Shortly after the merger discussions collapsed, Nexus began marketing and selling an invention that competes with the product that

---

[7] The Plaintiffs argue that summary judgment should be granted on all of the Defendants' counterclaims because Unlimited Power designated Petrella as its Rule 30(b)(6) witness and he "was not prepared" to testify about damages and said that he did not "have any information to give" regarding Unlimited Power's damages during his deposition. [Doc. 45 at 27-28 (citing Doc. 45-5 at 44)]. Petrella, however, testified that Unlimited Power lost purchase orders from Haiti and Panama because of Nexus's actions. [Doc. 45-5 at 44-45]. The Defendants filed those purchase orders in their response to the present Motion for Summary Judgment. [Doc. 50-3; Doc. 50-4]. Accordingly, the Defendants have provided a sufficient forecast of evidence regarding damages to survive summary judgment on that issue. Southern Bldg. Maintenance v. Osborne, 127 N.C. App. 327, 332, 489 S.E.2d 892, 896 (1997) (stating that the party seeking damages must provide more than "hypothetical or speculative forecasts" of damages).

25

was supposed to be developed with Unlimited Power as part of the merger. [Doc. 45-11 at 31]. Viewing the forecast of evidence in the light most favorable to the Defendants, and drawing all reasonable inferences in their favor, there is a genuine issue of material fact as to whether Nexus stalled the merger discussions to create more time to develop the kWAD and beat Unlimited Power's invention to market. Accordingly, summary judgment on the Defendants' UDTPA claim against Nexus will be denied.

### 5. UDTPA Claims against Conti, Bomer, and Prather

Conti, Bomer, and Prather also move for summary judgment on the Defendants' UDTPA counterclaim against them individually, arguing that the allegations are insufficient to pierce Nexus's corporate veil.[8] [Doc. 45 at 29]. The Defendants respond that they do not need to pierce the corporate veil of Nexus to hold Conti, Bomer, and Prather liable under the UDTPA because corporate agents can be held liable for torts that they personally commit. [Doc. 50 at 24].

"A corporate official may be held personally liable for tortious conduct committed by him, though committed primarily for the benefit of the corporation." Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 149 (4th Cir.

---

[8] This is the only argument that the Conti, Bomer, and Prather present on this issue.

1987); Sit-Set, A.G. v. Universal Jet Exch., Inc., 747 F.2d 921, 929 (4th Cir. 1984) ("Corporate officers may of course be liable jointly and severally with their corporation for obligations arising out of tortious conduct of the officers that subject the corporation to liability.").

With regard to the claims against Conti and Prather, the Defendants' forecast of evidence shows that Conti and Prather were both executives of Nexus who participated in the merger negotiations with Unlimited Power and in the decisions to develop, market, and sell the kWAD. [Id. at 37]. Because Nexus's conduct during the merger negotiations may ultimately serve as the basis for a UDTPA claim, the claims asserting that Conti and Bomer committed tortious conduct during those negotiations will also be allowed to proceed.

The UDTPA claim against Bomer, however, cannot survive summary judgment. Bomer merely worked as a design engineer at Nexus and had no role in the merger negotiations with Unlimited Power. [Doc. 45-11 at 30]. The Defendants present no forecast of evidence to show that Bomer was involved in the merger negotiations with Unlimited Power or the decision to develop, market, and sell the kWAD. As such, there is no forecast of evidence from which a reasonable jury could conclude that Bomer committed

any tortious conduct during those negotiations or otherwise.[9]  Accordingly, summary judgment will be granted as to the UDTPA claim against Bomer.

### B.    Plaintiffs' Claims for Correction of Inventorship

The Plaintiffs move for summary judgment on their claim for correction of inventorship, arguing that Conti is either co-inventor or the sole inventor of the '903 and the '213 Patents and that Bomer is either the co-inventor or the sole inventor of the '816 and the '030 Patents.  [Doc. 42 at 12-15].

Section 256 "provides a cause of action to interested parties to have the inventorship of a patent changed to reflect the true inventors of the subject matter claimed in the patent."  Fina Oil & Chem. Co. v. Ewen, 123 F.3d 1466, 1471 (Fed. Cir. 1997).  Section 256 "addresses two types of inventorship errors — misjoinder and nonjoinder.  Misjoinder is the error of naming a person as an inventor who is not an inventor; nonjoinder is the error of omitting an inventor."  CODA Dev. S.R.O. v. Goodyear Tire & Rubber Co., 916 F.3d 1350 (Fed. Cir. 2019) (citing Stark v. Advanced Magnetics, Inc., 119 F.3d 1551, 1553 (Fed. Cir. 1997)).  "Through claims of misjoinder

---

[9] While the Defendants contend that Bomer created images that "were taken directly from Mr. Petrella's ideas[,]" [Doc. 50 at 25], it is unclear how that conduct could constitute an unfair or deceptive trade practice or otherwise be considered tortious.

and nonjoinder together, § 256 allows complete substitution of inventors." Id. (citation and internal quotation marks omitted).

A claim under § 256 generally consists of two steps. See Trovan, Ltd. v. Sokymat SA, 299 F.3d 1292, 1302 (Fed. Cir. 2002). The court must first construe the patent claims in dispute "to determine the subject matter encompassed" by the claims. Id. The court must "then compare the alleged contributions of each asserted co-inventor with the subject matter of the properly construed claim[s] to . . . determine whether the correct inventors were named. Id. To prove joint inventorship under the second step, a co-inventor must have (1) contributed in some significant manner to the conception or reduction to practice of the invention, (2) made a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) done more than merely explain to the real inventors well-known concepts and/or the current state of the art. Pannu v. Iolab Corp., 155 F.3d 1344, 1351 (Fed. Cir. 1998). The alleged co-inventor must show also establish "some quantum of collaboration" with another inventor.[10] CODA, 2019 WL 847582,

---

[10] "To invent something, in the lexicon of patent law, is to conceive it." Levin v. Septodont Inc., 34 F. App'x 65, 70 (4th Cir. 2002) (unpublished) (citing Burroughs Wellcome Co. v. Barr Lab., Inc., 40 F.3d 1223, 1227–28 (Fed. Cir. 1994) (stating that "[c]onception is the

at * 6.  "[T]he critical question for joint conception is who conceived, as that term is used in the patent law, the subject matter of the claims at issue." Ethicon, Inc. v. U.S. Surgical Corp., 135 F.3d 1456, 1460 (Fed. Cir. 1998).[11]

At the first step, neither party provided any argument or analysis regarding claim construction for the Court.  [Doc. 45; Doc. 50; Doc. 51]. Because the parties do not dispute any claims in the Patents, the Court need not engage in claim construction to address the Plaintiffs' motion here. Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co., 379 F. Supp. 3d 53, 83 (D. Mass. 2019), aff'd, 964 F.3d 1365 (Fed. Cir. 2020) (stating that "a court need not hold a claim construction hearing if the parties do not request

---

touchstone of inventorship")).  Conception exists only when "a definite and permanent idea of an operative invention, including every feature of the subject matter sought to be patented, is formed in the mind of the inventor."  Sewall v. Walters, 21 F.3d 411, 415 (Fed. Cir. 1994).  An idea is sufficiently "definite and permanent" when "only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation."  Burroughs Wellcome, 40 F.3d at 1228.

[11] A plaintiff's testimony regarding his or her own inventorship claim "is regarded with skepticism," Price v. Symsek, 988 F.2d 1187, 1194 (Fed. Cir. 1993), and "cannot, standing alone, rise to the level of clear and convincing proof." Ethicon, 135 F.3d at 1461. Thus, a plaintiff "must provide evidence to corroborate the alleged joint inventor's conception." Eli Lilly & Co. v. Aradigm Corp., 376 F.3d 1352, 1358 (Fed. Cir. 2004). "Physical, documentary, or circumstantial evidence, or reliable testimony from individuals other than the alleged inventor or an interested party, may corroborate" a plaintiff's testimony.  Checkpoint Sys., Inc. v. All-Tag Sec. S.A., 412 F.3d 1331, 1339 (Fed. Cir. 2005).  The sufficiency of the proffered corroboration is determined by a "rule of reason" analysis in which all pertinent evidence is examined. In re NTP, Inc., 654 F.3d 1279, 1291 (Fed. Cir. 2011). Even under the "rule of reason" analysis, however, the "evidence of corroboration must not depend solely on the inventor himself." Cooper v. Goldfarb, 154 F.3d 1321, 1330 (Fed. Cir. 1998).

one."); <u>Gen. Elec. Co. v. Wilkins</u>, No. 1:10-cv-00674 LJO, 2012 WL 5989349, at *10 (E.D. Cal. Nov. 29, 2012) (stating that the terms of the patent would be broadly construed where the parties did not "dispute any particular term in the patent"), <u>aff'd</u>, 750 F.3d 1324 (Fed. Cir. 2014); <u>Ferring B.V. v. Allergan, Inc.</u>, No. 12-CV-2650 (PKC), 2019 WL 6183501, at *14 (S.D.N.Y. Sept. 27, 2019) (stating that where parties did not ask for claim construction, they conceded "that the meanings of the terms in the exemplary claims are 'clear and not in need of construction.'") (quoting <u>Eli Lilly</u>, 376 F.3d at 1360.

### 1.    '903 and '213 Patents

The Court first turns to the claims of sole and/or joint inventorship asserted by Conti with respect to the '903 and '213 Patents.  At the second step of the § 256 analysis, Conti must show some quantum of collaboration with Petrella, that he made a contribution "in some significant manner to the conception or reduction to practice of the invention[,]" that his contribution "is not insignificant in quality, when that contribution is measured against the dimension of the full invention," and that his contribution "does more than merely explain to the real inventors well-known concepts and/or the current state of the art."  <u>CODA</u>, 2019 WL 847582 at * 6; <u>Pannu</u>, 155 F.3d at 1351.

Defendant Petrella's deposition testimony appears to concede (or at least nearly concede) that Conti contributed to the '903 and '213 Patents by

providing the hinging solution and configuration for the solar panels. Petrella testified that he told Conti during the January 2013 meeting that he wanted a device with "two high efficiency solar panels that would be placed in a cavity" and could be deployed. [Doc. 45-5 at 23-35]. Petrella testified that he never discussed how the solar panels would be configured and only told Conti about "the problems that we would have . . . with hinging solutions" for the solar panels. [Id. at 23]. Petrella told Conti that he was going to seek help from a "mechanical enclosure manufacturer" regarding the issues he was having with the configuration of the solar panels in the device and hinging solutions for the solar panels. [Id.]. As such, Petrella's own testimony indicates that he had not definitively conceptualized how the solar panels would be configured within the device, how the solar panels would be attached to the device, or how the solar panels would be deployable as of the January 2013 meeting. Accordingly, Petrella's testimony suggests that he had not "formed a definite and permanent idea of an operative invention, including every feature of the subject matter sought to be patented" as of January 2013. Sewall, 21 F.3d at 415; Coleman v. Dines, 754 F.2d 353, 359 (Fed. Cir. 1985) (conception must include every feature of the claimed invention for sole inventorship).

Petrella testified that he could not recall providing Conti with any technical information or further details between January 2013 and March 5, 2013. [Doc. 45-5 at 24; Doc. 45-11 at 25]. On March 5, 2013, Conti sent Petrella the PREPS Proposal, which provided the first specific details and figures for configuring the solar panels, attaching the solar panels to the device, and making the solar panels deployable. [Doc. 45-2; Doc. 45-5 at 24]. By providing those details, Conti's PREPS Proposal improved upon the prototypes that Petrella provided during the January 2013 meeting, provided the first configurations for the solar panels within the device, and resolved the problems Petrella was having with hinging the solar panels to the device and making them deployable.

In sum, the Plaintiffs have presented a forecast of evidence from which a reasonable jury could conclude that Conti's contribution was "not insignificant in quality, when that contribution is measured against the dimension of the full invention," and that Conti's contribution did "more than merely explain to the real inventors well-known concepts and/or the current state of the art." Pannu, 155 F.3d at 1351. Based on that forecast of evidence, a reasonable jury could find that Petrella is not the sole inventor of the '903 and '213 Patents and that Conti is a co-inventor of those Patents. Id. Nevertheless, Conti must establish that he is a co-inventor "by clear and

33

convincing evidence." See Hess v. Advanced Cardiovascular Sys., Inc., 106 F.3d 976, 980 (Fed. Cir. 1997) (stating that "[t]he burden of showing misjoinder or nonjoinder of inventors is a heavy one and must be proved by clear and convincing evidence" (internal quotation marks and citation omitted)). Therefore, Conti's Motion for Summary Judgment as to co-inventorship will be denied. See Levin v. Septodont Inc., 34 F. App'x 65, 76 (4th Cir. 2002) (unpublished) (Motz, J., concurring) (stating that summary judgment on a co-inventorship claim should be denied where the movant fails to rebut the presumption that a patent's named inventors are correct by meeting the "demanding standard" of providing clear and convincing evidence).

The Court turns next to Conti's Motion for Summary Judgment on his claim for misjoinder of Petrella as inventor on these patents. [Doc. 45 at 16]. Removal of a named inventor from a patent also requires proof by clear and convincing evidence. Cook Biotech. Inc. v. Acell, Inc., 460 F.3d 1365, 1373 (Fed. Cir. 2006); Eli Lilly, 376 F.3d at 1358–59. To show sole inventorship of the Patents, Conti bears the burden of showing that he conceived of every claim of the patent and that any contribution by Petrella to the conception of each claim was insignificant. Id.

34

Based on the forecasts of evidence presented by the parties, the Court concludes that summary judgment on the issue of Petrella's inventorship of the '903 and the '213 Patents is inappropriate here. Conti has not presented a forecast that would constitute clear and convincing evidence as a matter of law that he conceived of *every feature* of the subject matter reflected in the '903 and '213 Patents.

Determining who conceived each feature of the Patents will require determinations by a fact-finder with the opportunity to examine all the evidence and evaluate the strength of the evidence or credibility of witnesses. Notwithstanding Petrella's concessions in his deposition testimony, genuine issues of material fact remain regarding the party who conceived of each feature in the '903 and '213 Patents. Therefore, summary judgment will be denied on Conti's claims for joint and/or sole inventorship (nonjoinder and misjonder).

### 2. '816 and '030 Patents

Bomer asserts that he should be made a co-inventor of the '816 and '030 Patents because he created the images that are contained in those Patents. [Doc. 45 at 17-18]. The Defendants respond that "Petrella provided the original ideas and designs to Nexus to set forth in drawings." [Doc. 50 at 11-12].

Based on the parties' forecasts of evidence, a reasonable jury could conclude that Bomer drafted the images that are reflected in the '816 and '030 Patents and that the parties therefore collaborated on these Patents. [Doc. 45-5 at 35-36; Doc. 45-11 at 30-31].[12] Genuine issues of fact remain, however, as to whether those images were created by Bomer or whether Bomer interpreted those images from the ideas and designs that Petrella provided. Further, while Petrella testified that he conceived of several features that are reflected in the '816 and '030 Patents, genuine issues of fact remain as to whether Petrella conceived of each feature of the design before he received the images created by Bomer. Because factual issues exist regarding the extent of Petrella's contribution to the images created by Bomer, summary judgment is inappropriate on Bomer's correction of inventorship claims on the '816 Patent and the and '030 Patent. Accordingly, Bomer's Motion for Summary Judgment on that claim will be denied.

---

[12] Both of these patents are design patents, which would be analyzed with regard to the relative contributions to the design and its "novel, ornamental features." OddzOn Products, Inc. v. Just Toys, Inc.,122 F.3d 1396, 1405 (Fed. Cir 1997).

# O R D E R

**IT IS, THEREFORE, ORDERED** that ""Plaintiffs/Counterclaim-Defendants' Motion for Summary Judgment" [Doc. 44] is **GRANTED IN PART** and **DENIED IN PART** as follows:

(1) The Motion is **GRANTED** as to Defendants' counterclaims for breach of contract, unjust enrichment, and conversion, and such claims are hereby **DISMISSED WITH PREJUDICE**.

(2) The Motion is **GRANTED** as to Defendants' counterclaim for unfair and deceptive trade practices against Bomer, and such claim is **DISMISSED WITH PREJUDICE**.

(3) The Motion is **DENIED** as to Defendants' counterclaims for unfair and deceptive trade practices against Nexus, Conti, and Prather.

(4) The Motion is **DENIED** as to Conti's claim for correction of inventorship of the '903 and '213 Patents.

(5) The Motion is **DENIED** as to Bomer's claim for correction of inventorship of the '816 and '030 Patents.

**IT IS SO ORDERED.**    Signed: November 25, 2020

Martin Reidinger
Chief United States District Judge

37